UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:08CR394 HEA ) |
| RONALD EUGENE JONES, | ) ) |
| Defendant. | ) ) |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). Presently pending is the Defendant's motion to suppress the contents of any and all electronic surveillance.

**#115--Defendant's Motion to Suppress the Contents of Any and all Electronic Surveillance**

Based upon the evidence adduced at the hearing on the motion to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Court Authorized Title III Wiretaps

Based upon the following facts, the undersigned concludes that the evidence obtained from the California and Missouri wiretaps in the case now at bar were lawfully obtained and should not be suppressed. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510, et seq., and its progeny provide for the interception of wire, oral, and electronic communication under certain circumstances. The California statutes used in this case in San Diego directly copy from and follow the federal act. Under these statutes, an order for electronic

surveillance may be entered by a United States District Judge upon application of a federal law enforcement officer who has been authorized to make such an application by the United States Attorney General or his authorized designee. An authorization for such application is presumed to be valid, unless the person challenging the application makes a prima facie showing that it was not so authorized. See United States v. O'Connell, 841 F.2d 1408, 1416 (8th Cir. 1988). The application must include a full and complete description of the facts relied upon, including details of the alleged offense; the description of the facilities where the communications are to be intercepted; a description of the communication sought to be intercepted; the identity of persons known whose communications will be intercepted; whether or not other investigative procedures had been tried and failed, and the period of time for which interception is requested. The application must also include whether previous applications involving the same facilities, persons, or places have been made. See 18 U.S.C. § 2518(1). The applications here contain all the statutorily required material. Thus, there was no error in the form of the application.

Under § 2518(3), the court may issue an order only if it finds probable cause to believe that 1) a person is committing one of the crimes enumerated in 18 U.S.C. § 2516; 2) the communications concerning such offense will be obtained through the interception, and 3) the place where the communications are to be intercepted is being used in connection with the commission of such offense. A review of the evidence reveals that probable cause has been shown for each of the above three items, both in the California wiretaps and in the Missouri wiretaps. Probable cause required for a wiretap order "does not differ from that required by the Fourth Amendment for a search warrant." United States v. Macklin, 902 F.2d 1320, 1324 (8th Cir. 1990). See United States v. Leisure, 844 F.2d 1347, 1354 (8th Cir. 1988). As stated in Macklin, supra,

> The task of the issuing magistrate is simply to make a practical, commonsense (*sic*) decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for. . . conclud[ing]" that the probable cause existed.

Macklin, 902 F.2d at 1324.

As is the case in other search warrant affidavits, the Supreme Court has stated:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1949).

Further, probable cause in an affidavit, "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, 462 U.S. 213, 232. (1983).

It is also clear that information from a reliable informant, without more, may provide probable cause for the issuance of a search warrant. See United States v. Pressley, 978 F.2d 1026 (8th Cir. 1992). In addition, even an anonymous tip from a crime stopper's hotline or an informant whose reliability has not been tested is sufficient information upon which to create probable cause as long as there is adequate corroboration of even innocent details. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

### A. The Wiretaps Authorized in San Diego, California

On January 4, 2008, Special Agent Martha Dawe of the San Diego office of the Drug Enforcement Administration ("DEA"), filed an affidavit before the Honorable Jeffrey Frazier, Judge of the San Diego County Superior Court, requesting permission to intercept conversations on two

target telephones which were detailed in the affidavit. Target telephone #1 was used by Richard Rodriguez, and was a cellular telephone registered to the name of another person. Richard Rodriguez is indicted in the case now at bar in this district. The second telephone was allegedly used by Mario Carrillo-Ramirez. The fifty page affidavit filed before Judge Frazier in support of the interception order states in pertinent part as follows:

> Richard Rodriguez has been involved for approximately eleven years in a drug organization based in San Diego, California and Tijuana, Mexico. Rodriguez was originally a courier for this organization, however, now he coordinates drug shipments for the organization throughout the United States and Puerto Rico. His duties include the coordination of vehicles and other transportation methods, the collection of proceeds, the control of multi-kilograms of heroin, and the remission of the proceeds to Mexico. Another member of this conspiracy, is a person named Victor Villarreal. Villarreal is alleged by Agent Dawe to be the leader of the drug organization in the United States who has contact with a source of supply in Mexico. Villarreal often travels to Mexico with Rodriguez to meet with the source of supply and arrange for shipments of drugs to be brought into the United States. Specifically, after the drugs are imported into the United States, the drugs are distributed through Rodriguez to St. Louis, Chicago, San Diego, Puerto Rico, and other areas in the United States. During the course of the investigation into this matter, the San Diego DEA developed a confidential source or reliable informant, who they had used on previous occasions and whose information had been reliable in the past. This informant provided them with the above information. This informant, in conversations directly with Rodriguez, learned through Rodriguez that Rodriguez was selling multi-kilogram quantities of heroin to a person in St. Louis, known only as "Creer." Rodriguez told the informant that Villarreal has a good source of supply in Mexico. Rodriguez was

guarded about the source and neither DEA nor the informant has been able to discover the identity of the source. Rodriguez told the source that he wire transfers drug money to Mexico, but uses only Mexican grocery stores, and always uses aliases when transferring the money. In conducting a surveillance on Rodriguez, agents were able to observe him going to various grocery stores and using wire transfers to transfer money to Mexico. They were able to check at one of these grocery stores, and determine that Rodriguez used a fictitious name in sending the money to Mexico. During telephone conversations with the informant over target telephone #1, Rodriguez told the informant that he had, in August and September 2007, delivered multi-kilogram quantities of heroin to the individual "Creer" in St. Louis, and collected approximately $80,000 for the heroin which he remitted to California. This conversation was made over the target telephone which is the subject of the wiretap application. Further, after this direct conversation, in August or September, the informant was arrested by separate authorities for possession with intent to distribute methamphetamine. This criminal activity was carried out in violation of his agreement with the DEA, and the informant is now serving time in jail for this offense and is no longer cooperating. In order to determine that Rodriguez and others were still involved in drug-dealing activity, numerous surveillances were set up on Villarreal and Rodriguez in the San Diego area during the middle to late part of November 2008. These surveillances revealed activity consistent with continued importation of drugs and the distribution of drugs around the country. The agents attempted to place a GPS device on Rodriguez's vehicle, however, he often went to the Country of Mexico with Villarreal to meet with the source of supply, and the agents were unable to surveil him or follow him into Mexico. In addition, pen registers and subpoenaed toll records on target telephone #1 used by Rodriguez continued to show contact with the other conspirators up to the end of December 2007. They also

5

included contacts with individuals in St. Louis, who the agents were unable to positively identify. Eventually, "Creer" was identified as Ronald Jones, but only after the Judge signed the wiretap order on target telephone #1, and agents were able to conduct a surveillance and make a stop, based on a ruse, of Jones and his girlfriend and identify them.

Thus, based on the above facts, the undersigned concludes that there was ample probable cause shown to issue an order to intercept the communications of Rodriguez over cellular telephone, target #1. The agents were aware from monitoring of phone calls by the confidential informant, before his arrest, that Rodriguez discussed drug activity on this phone. These phone calls directly related to Rodriguez's dealing of drugs in the St. Louis area, as well as his obtaining drugs from Mexico, and his operations around the country. When this is combined with the surveillances conducted in November, and the confirmation that the phone was still being used to contact his co-conspirators in December, the undersigned concludes that there was at least a "fair probability" the phone was still being used by Rodriguez to carry on his drug dealing activity. Therefore, there was probable cause for issuance of the warrant.

B. Wiretaps Authorized in St. Louis, Missouri

After Jones was identified as a major distributor of heroin in the St. Louis area, which heroin he obtained at least in part from the Mexico/San Diego drug organization of which Rodriguez was a member, the DEA applied for warrants to monitor the cellular telephones that Ronald Jones was using to further his drug activity. In this regard, they applied for warrants to monitor target telephones ## 1, 2 and 3 respectively on March 27, 2008, April 4, 2008, and April 25, 2008. All of the above cellular telephones and at least three predecessor telephones were used by Jones who kept switching cellular telephone because either he or Rodriguez believed that DEA was following them

or attempting to wiretap them. In all, the Defendant used at least six separate telephones in a three-month period. Rodriguez used at least three separate telephones and often used pay phones to avoid detection. The affidavit in support of the order to intercept conversations on target telephones ## 1, 2 and 3, repeat much of the same information with a few pertinent updates. The affidavits state in pertinent part as follows:

    The affidavits state that in 2001, a courier of heroin was stopped in Rolla, Missouri, and multi-kilograms of heroin were seized from this courier. The courier agreed to cooperate with DEA and checked into a motel in the St. Louis area, calling a phone number given to her. Shortly after that, Ronald Jones was observed by DEA to drive his wife to the motel, drop her off, and then leave the area. The spouse entered the room and retrieved the narcotics. She then called a cab to leave. Eventually, Jones and his wife were arrested, and the wife was charged with possession with intent to distribute heroin. The spouse received significant jail time, and the charges against Jones were dismissed. Further, in June 2007, DEA agents in San Diego learned that one of Rodriguez's couriers had been stopped at the Oklahoma City bus terminal, and approximately two and one half kilos of heroin were seized from the courier. The courier told the agents that he was to deliver the drugs to St. Louis, but would not further cooperate with DEA. DEA determined that this was Rodriguez's heroin from Rodriguez's admission to confidential source #1 in San Diego. In August, 2007, agents determined from confidential source #1 that Rodriguez was in St. Louis delivering multi-kilograms of heroin to "Creer" who was later identified as Jones. They determined that Jones paid Rodriguez the $80,000 for the heroin, which Rodriguez then remitted through Mexican grocery stores to San Diego and to Mexico. In January 2008, after the San Diego wiretap was established, agents identified "Creer" as being Ronald Jones, and after that date, from January until March 18, the agents recorded

numerous phone calls on Rodriguez's cellular telephones from Rodriguez to Jones. These calls relate the amount of heroin that Rodriguez was obtaining for Jones, the manner in which the money was to be remitted, and the manner in which heroin would be delivered to Jones. The conversations also detailed Jones giving heroin to Rodriguez for his own personal use when Rodriguez would come to St. Louis to collect money from Jones. The wiretaps revealed that Jones did not touch the heroin while it was being transported from California to St. Louis, but, instead, used other couriers and a truck with hidden compartments. He also used several females to insulate himself from detection by police authorities, and only dealt with individuals who he had known for long periods of time. Further, on March 18, 2008, just one week prior to a wiretap order being signed, Rodriguez and Jones had a conversation on the target telephone in which Rodriguez told Jones that he could obrtain three kilos of heroin from him in the next two days and would call him back about the delivery.

The application for target cellular telephone #2 stated that Jones had dumped or quit using target telephone #1 (apparently because he feared detection) on the same date that the wiretap on telephone #1 was activated. Because of this, no conversations were intercepted on target telephone #1. As to target telephone #2, Jones was intercepted on the San Diego wiretap calling Rodriguez and telling him that he had a new telephone number. Because of this interception, the agents were able to determine the number of target telephone #2, and were also able to determine from his contacts with Rodriguez and his other pattern of calling activity, that he was using telephone #2 to further his drug activity. As to the application for monitoring of cellular telephone #3, after the wiretap on target telephone #2 was activated, the agents were able to determine by listening to Jones that on April 8, 2008, Jones observed a DEA surveillance vehicle parked in the vicinity of his house on Wells Avenue. He accurately picked out the surveillance vehicles, and called other persons in the

neighborhood to ask them to verify if any other vehicles were on the surveillance. He stated that he was going to dump the cellular telephone that he was using and obtain another one. The records show that on that same date, someone purchased a cellular telephone using a fictitious name, and Jones began using that cellular telephone to conduct his drug business. All of the telephones which all of the defendants used were either prepaid telephones in no name, or used bogus or alias names as registrations and not their own names. Further, the interception of calls on cellular telephone #2 showed that the Defendant was working with Barbara Tyler, one of the women he used to courier and sell heroin, to obtain a separate source of heroin in Miami, Florida. In addition, the Defendant instructs other people who are distributing heroin for him to use third parties and never get close to the heroin. He tells them that they can protect themselves in this way.

Therefore, based on the above, the undersigned concludes that the affidavit shows very substantial probable cause to believe that target telephones ## 1, 2 and 3, were being used to further Defendant's drug trafficking operation, and that monitoring of those phones would yield valuable evidence which could be used for the prosecution of these matters.

C. Necessity

The Defendant alleges that neither of the affidavits or testimony in this matter establish a necessity for the wiretap. § 2518(1)(c), provides that an application for an order authorizing a wiretap must include, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed, or why they reasonably appear to be unlikely to succeed if tried, or to be too dangerous." The Defendant alleges that the affidavit does not meet the standard because it contains few specifics, and only uses boilerplate language to establish necessity. He cites a Ninth Circuit case to show that the affidavit is insufficient. Because the affidavit and

9

testimony of the agents shows necessity with adequate specificity and because what the Defendant alleges is "boilerplate" has been held sufficient in the Eighth Circuit, the Defendant's argument must fail. In the case of United States v. Milton, 153 F.3d 891 (8th Cir. 1998), a wiretap case in which the Defendant alleged that the affidavit did not sufficiently detail the necessity, the Court stated as follows in upholding the language in the affidavit:

> The affidavit describes traditional investigative techniques and explains why these techniques do not normally prove successful when targeting drug conspiracies. Most of the assertions would be true in any drug investigation. The reasons given include witnesses's fear in answering questions and propensity of individuals to plead the Fifth; the fact that normal surveillance only exposes meetings between individuals, leaving agents to guess at the purpose of the meetings; the residential nature of the neighborhood precludes agents from remaining near the suspicious residence; and that phone records only reveal that conversations between individuals took place but do not reveal the nature of the conversations. The only reason given that was specific to this particular investigation was that the suspects kept the trash container for the residence on the front porch, making it impossible for agents to search the garbage.
>
> Although some of these assertions might appear boilerplate, the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing. Drug crime is necessarily harder to detect than other crimes because it is difficult to witness and does not create victims who are compelled to come forward and report the crime. Furthermore, agents preparing the affidavits supporting applications for electronic surveillance are not required to exhaust "all possible investigative techniques" before a court and issue an order authorizing interception of wire communications. _U.S. v. Falls_, 34 F.3d 674, 682 (8th Cir. 1994). The necessity prong of § 2518(3)(c) is a finding of fact subject to a clearly erroneous standard of review. . . We find no error in the district court's refusal to suppress the wiretap evidence based on a lack of necessity.

153 F.3d 891, 895, 896 (8th Cir. 1998).

In United States v. Thompson, 210 F.3d 855 (8th Cir. 2000), the Court again dealt with this same issue. First, the Court determined that necessity is established where the affidavit demonstrated that traditional procedures would fail to expose the full extent of the conspiracy and all conspirators. See United States v. Smith, 909 F.2d 1164, 1166 (1990). Additionally, the Court stated that it was

not required that law enforcement officers exhaust all possible techniques before applying for a wiretap, and it was not necessary for the officers to try techniques which are likely to fail. See United States v. Macklin, 902 F.2d 1320 (8th Cir. 1990).

Initially, the undersigned notes, as stated above, that the necessity requirement is determined relative to the scope of the investigation. Since the full scope of a large conspiracy may be more difficult to fully prosecute without a wiretap, necessity must be considered along with the scope of the investigation. See United States v. Jackson, 345 F.3d 638 (8th Cir. 2003).

In both the San Diego and St. Louis affidavits, the scope of the matters to be investigated is quite broad. As to the San Diego investigation, the affidavit states as follows regarding the scope of the investigation:

> As extensively detailed below, these ordinary investigative procedures have been and will be ineffective in helping DEA achieve legitimate goals of this investigation which include the gathering of direct admissible evidence to prove beyond a reasonable doubt: a) the nature, extent, methods, and scope of the narcotics business of the target subjects and other yet unknown; b) the identities, locations, and roles of accomplices, aiders and abettors, co-conspirators and participants in the above described criminal activity, in particular those persons storing, transporting, and distributing narcotics; c) the locations and items used in furtherance of the above criminal activity in particular locations where controlled substances are stored, and the locations where controlled substances are distributed; d) the existence and locations of records pertaining to the above described criminal activity; e) the locations and sources of resources used to finance the above criminal activity, and f) locations and dispositions of proceeds from the above described criminal activity.

As to the St. Louis affidavit, the scope of the investigation is described as follows:

> 1) The nature, extent and methods of operation of the heroin distribution organization of the target subjects and others yet unknown; 2) the identities and roles of leaders, accomplices, aiders, abettors, conspirators and participants in the illegal activities; 3) the distribution and transfer of contraband and money involved in those activities; 4) the existence and location of records pertaining to those activities; 5) the location and sources of resources used to finance their illegal activities; 6) the location and disposition of the proceeds from those activities; 7) location of items used in

11

furtherance of those activities, and 8) admissible evidence as to the commission of the above described offenses.

Further, contrary to what the Defendant states, specific examples are given of investigative techniques that have been used to attempt to obtain the evidence to show the full scope of the conspiracy as well as indications as to how those techniques have failed to reveal the full scope of the conspiracy.

For example, on November 29, 2007, one of the co-conspirators exited what the DEA believed to be a "stash" house in San Diego. They attempted to follow him but could not do so because the conspirator made U-turns in the middle of the street and exceeded the speed limit in residential areas. Agents had to break off surveillance for fear that they would be observed. Further on November 2, 2007, the agents attempted to follow Richard Rodriguez from his house, however, they were unable to do so because the Defendant kept driving around the block and using other evasive techniques and the agents were again concerned about being observed. Also, on November 2, 2007, the agents placed a tracking device on Rodriguez's car, however, after meeting with another conspirator, he drove to the Country of Mexico, and the agents could not follow him there. On October 21, 2007, the San Diego police department in conjunction with the DEA conducted a parole search of one of the subjects in this investigation. The evidence yielded by the search did not prove very helpful to the investigation. Next, on January 19, 2007, the agents had to break off surveillance of Rodriguez because he was using evasive techniques, and they found him to be very leery of law enforcement. In this regard, the Defendant often changed cellular telephones because he believed he was being followed or wiretapped, used fictitious names in registering those cellular telephones and used pay phones to avoid detection. All of this made the use of pen registers less effective. Further, the affidavit states that Rodriguez used fictitious names when transferring money obtained from the

organization's narcotics transactions to Mexico and to other places. This made the use of subpoenas and cash transaction reports less likely to reveal any valuable information. Also, the agents at one time had the use of an undercover informant, however, the informant could never purchase narcotics from Rodriguez, nor could the informant learn the source of narcotics in Mexico, or learn the name of the person who Rodriguez was dealing with in St. Louis. Eventually, DEA had to terminate the informant because he became involved in other criminal activity. Further, the affidavit states that at least one of the locations used by the defendants was difficult to surveil because agents had to drive down a dead end alley in order to see the location.

As to the St. Louis agents, the affidavit stated that since 2003, the agents in St. Louis had utilized and attempted to utilize surveillance on many of the target subjects in St. Louis, including Jones. The surveillances had proven problematic, however, because the subjects often used evasive maneuvers such as driving around the block several times, checking in their rearview mirrors, accelerating and decelerating without any apparent reason, and pulling to the curb in the middle of a block and just watching the traffic.

As an example of this, on January 24, 2008, agents attempted to surveil Jones when he was leaving his house on Wells Avenue. During this surveillance, Jones was seen to look in his rearview mirror, and when he arrived at his destination, passed up several obvious parking places to park a considerable distance from the house with which the agents believed he was associated. After parking the car, he sat in his car for several minutes and observed traffic. Further, on March 11, 2008, the agents again attempted to follow Jones, but were unable to do so because of his evasive maneuvers. The affidavit also documented the fact that Jones switched telephones on occasions to avoid detection, used several women and other people to sell and carry drugs in order to avoid detection,

and would not deal directly with the only confidential informant which DEA was able to cultivate. The affidavit states both in general terms based on the expertise of the agents and specifically as detailed above, how conventional investigatory techniques such as surveillance, pen registers, search warrants, informants, undercover agents and trash pulls would not be successful in fully exposing the extent of the conspiracy and the identity of each conspirator. Based on the above, the undersigned concludes that the necessity requirement has been met.

### D. Minimization

Additionally, Title III includes certain post-authorization duties, including objectively reasonable efforts to minimize any unauthorized interceptions. 18 U.S.C. § 2518(5). See United States v. Smith, 909 F.2d 1167. Further, the Court in United States v. Macklin, 902 F.2d 1320 (8th Cir. 1990) stated as follows regarding minimization:

> In considering whether the government's conduct was reasonable, the reviewing court must consider a variety of factors including the scope of the enterprise, the agent's reasonable expectation of the content of the call, the extent of judicial supervision, length and origin of a call, and use of coded or ambiguous language... More extensive wiretapping is reasonable when the investigation focuses on determining the scope of a widespread conspiracy...The same is true when the conversations are in the jargon of the drug trade...Thus, the government's conduct could be reasonable even if the total number of conversations intercepted contained a high percentage of nonpertinent calls.

United States v. Macklin, 902 F.2d at 1328.

In the case now at bar, the Assistant United States Attorney provided the agents with detailed written instructions and oral instructions as to the proper minimization procedures. Each monitoring agent had to read and did read the procedures, and signed a statement stating that the monitoring agent had read and understood the minimization procedures. In addition, the agents were closely supervised both by the Assistant United States Attorney and by the two case agents in this matter.

Thus, the agents were properly instructed as to minimization procedures. In addition, as can be seen from the affidavits in this matter, much of the conversation involved in the wiretaps is done in code of drug trade and jargon, and was done with a view toward giving the person listening as little information as possible. Many of the conversations were less than two minutes in duration according to the summary introduced into evidence. In addition, some of the completed phone calls in this matter were not monitored as they took place during the hours of midnight to 8 a.m. when the phone was not being monitored by agents. In addition, as is shown by Government's Exhibit 3, a significant number of the non-pertinent phone calls were, in fact, minimized. Therefore, absent a more specific complaint, the undersigned concludes that the agents complied with the minimization requirement of the statute, and that their minimization was objectively reasonable. See United States v. Homick, 964 F.2d 899, 903 (9th Cir. 1992); United States v. Ozar, 50 F.3d 1440, 1447-1448 (8th Cir. 1995). Therefore, the undersigned concludes that the minimization procedures were proper, and the monitoring of the court-authorized wiretap was reasonable.

## Conclusion

Based on all of the above, the undersigned finds that the Defendant's motion to suppress should be denied.

* * *

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress the Contents of Any and all Electronic Surveillance [Doc. #115] be **denied**.

Further, the parties are advised that they have eleven (11) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

/s/ Terry I. Adelman<br>UNITED STATES MAGISTRATE JUDGE

Dated this  6th  day of March, 2009.